OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Alice Van Buren, filed May 22, 2006. Van Buren appeals the juvenile court's April 24, 2006, decision adopting the magistrate's decision granting joint custody of Van Buren's twin grandsons to Van Buren and the boys' half-sister, Lanisha Woodmore. On April 22, 2005, Woodmore petitioned the court for custody of the boys, after their father, Ronald Wade, killed their mother, Cynthia D. Jennings-Wade, on March 25, 2005. Woodmore is the biological daughter of Ronald Wade, who is incarcerated. Van Buren is the biological mother of the deceased, Cynthia, and the maternal grandmother of the twins.
 {¶ 2} Following Cynthia's murder, Van Buren, a resident of Southfield, Michigan, traveled to Dayton, Ohio and picked up her granchildren. Van Buren had an ongoing relationship with her grandsons, having visited them often and hosted them at her home for a week each summer. Woodmore resides in La Mirada, California with her husband and three sons. Prior to seeking custody, she had only seen her half-brothers one time. On June 23, 2005, the magistrate held a hearing to determine interim custody of the children pending the September 22, 2005 trial. The magistrate ordered that the boys remain with Van Buren until July 15, 2005, at which time Woodmore was to arrange their transportation to her home in California, where they would remain until a full hearing.
 {¶ 3} At the custody hearing, the magistrate heard testimony from Woodmore and her husband, Lodis Woodmore, as well as from Van Buren and Theo Smith, an investigator hired by Van Buren. The magistrate also considered a report by the boys' guardian ad litem, which recommended that the magistrate award legal custody to Van Buren and visitation to Woodmore. While the magistrate awarded joint custody to Woodmore and Van Buren, she designated Woodmore as the primary and residential custodian for school purposes. The magistrate awarded Van Buren custody of the boys beginning one week after the end of their school year until two weeks before the start of school, and also during one week of their Christmas break and one week of their spring break.
 {¶ 4} The magistrate determined that Van Buren's and Woodmore's homes were "appropriate for the children to reside in." She noted that the boys themselves indicated that they wanted to live with both Van Buren and Woodmore, but that they were "not mature enough to understand the proceedings or understand a permanent living arrangement." The magistrate found that "there was no evidence presented that causes the court concern regarding the children's health and welfare in either of the two homes."
 {¶ 5} The magistrate found that Van Buren and Woodmore both provided appropriate care for the children. It was significant to the court that Woodmore "has children closer in age to the children and that Mr. Mrs. Woodmore are more likely to provide a permanent home for the children." The magistrate found that "the children deserve to have stability" and noted that "the children are very active five year olds." Of concern to the court was the fact that Van Buren was 60 years old, and her husband was 80 years of age. "Certainly there are no guarantees in life regarding life expectancy, but it is more probable that [the Woodmores] will be able to provide care for the children until the children reach the age of majority than the [Van Burens]. The magistrate found that Woodmore "has demonstrated more willingness to facilitate a relationship for the children with [Van Buren] than [Van Buren] has regarding facilitating a relationship between the children and [Woodmore]."
 {¶ 6} The magistrate noted that her decision was not in accordance with the guardian ad litem's recommendation; it was of import to the magistrate that the guardian ad litem "was not able to see the children in either of the home environments to view the interactions between the children and petitioners."
 {¶ 7} Van Buren asserts five assignments of error which we will address together. They are as follows:
 {¶ 8} "THE LOWER COURT ERRED IN FINDING THAT PETITIONER'S HOME WAS APPROPRIATE EVEN THOUGH THERE WAS TESTIMONY THAT IT WAS TOO SMALL AND ALL OF THE WINDOWS WERE COVERED WITH NEWSPAPER."
 {¶ 9} "THE LOWER COURT ERRED IN FINDING THAT THERE WAS NO NEED FOR ANY CONCERN REGARDING THE CHILDREN'S HEALTH, EVEN THOUGH THEY SHOWED AT THE HEARING WITH RINGWORM, WHICH WAS STILL PRESENT AS OF APRIL 2006 AND DEMETRIOUS WAS STILL WETTING THE BED."
 {¶ 10} "THE LOWER COURT ERRED IN FINDING THAT THERE WAS NO EVIDENCE TO SHOW THAT THE PETITIONER WAS IN EXTREME DEBT."
 {¶ 11} "THE LOWER COURT ERRED IN USING AGE ACCORDING TO THE LIFE EXPECTANCY TABLES AS A BASIS TO DENY PRIMARY CUSTODY TO THE RESPONDENT."
 {¶ 12} "THE LOWER COURT ERRED IN FINDING THAT THE PETITIONER HAD BEEN WILLING TO FACILITATE A RELATIONSHIP BETWEEN THE BOYS AND THE RESPONDENT."
 {¶ 13} "[A]n appellate court reviews a juvenile court's custody determination for an abuse of discretion. (Internal citations omitted). An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment. (Internal citations omitted). The discretion afforded to a juvenile court in custody matters `should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" In theMatter of K.R. and M.R., Montgomery App. No. 2006-CA-15, 2006-Ohio-5801.
 {¶ 14} When making a custody determination, "the court shall take into account that which would be in the best interest of the children." R.C.3109.04(B)(1). "In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to:
 {¶ 15} "(a) The wishes of the child's parent's regarding the child's care;
 {¶ 16} "(b) If the court interviewed the child in chambers * * * regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
 {¶ 17} "(c) The child's interaction and interrelationship with the child's parent's siblings, and any other person who may significantly affect the child's best interest;
 {¶ 18} "(d) The child's adjustment to the child's home, school, and community;
 {¶ 19} "(e) The mental and physical health of all persons involved in the situation;
 {¶ 20} "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
 {¶ 21} "* * *
 {¶ 22} "(h) Whether either parent has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; * * * and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;
 {¶ 23} "(j) Whether either parent has established * * * a residence, outside this state." R.C. 3109.04(F)(1).
 {¶ 24} "A trial court is not required to follow the recommendation of a guardian ad litem. (Internal citations omitted). The function of a guardian ad litem is to consider the best interests of a child and to make a recommendation to the court, but the ultimate decision in any proceeding is for the judge, and the trial court does not err in making an order contrary to the recommendation of the guardian ad litem."In the Matter of P.T.P. Custody, Greene App. No. 2005 CA 148,2006-Ohio-2911.
 {¶ 25} Woodmore testified that her home has three bedrooms. Her three children, aged nine, five and two, share one bedroom, and the Wade children share one bedroom. Woodmore explained that her windows were covered with newspaper while the home was being remodeled, and that she planned to install wooden blinds. We note that in her brief Woodmore asserts that she and her husband are building a larger home into which they plan to move in December, 2006.
 {¶ 26} During the custody hearing, it was established that the children contracted ringworm while at Woodmore's home. Regarding ringworm Woodmore testified, "My baby did have that on his head. It started with my middle son. He had got it from school. And the baby got it. And so, the doctor recommended that I gave them the same thing to prevent them from getting it. But, they got it from contact. They like to rub on Dimitri's head, and I told them not to do that. But, he's a little boy and that's — you know, I can't say that is how they got it, but they've had some type of contact with him." Attached to Van Buren's brief is a copy of a letter sent to the trial court from counsel for Van Buren, along with copies of prescriptions for ringworm medication, indicating that the boys continued to suffer from ringworm in April, 2006, seven months after the trial.
 {¶ 27} The guardian ad litem's report indicates that Theo Smith "provided this Guardian with a copy of Ms. Woodmore's credit check, which evidences multiple refinancing of her home and approximately $500,000.00 of debt." Woodmore testified that she and her husband have "almost two hundred thousand" dollars in equity in their home, and she denied being over her head in debt.
 {¶ 28} Van Buren argues that there "was no evidence presented to suggest that age would hinder or has hindered Respondent's ability from raising the children appropriately." In her brief, Woodmore argues, "Although testimony was offered indicating that Mr. Van Buren was in good current health, the parties were careful not to have him appear at the hearing to jeopardize their case due to his aging, nor did he testify as to his daily activities."
 {¶ 29} Van Buren argues that "recent events" indicate that "the Woodmores are attempting to distance the boys from their maternal grandmother." According to Van Buren, she did not have visitation with the boys over their Christmas break. Woodmore "moves to vacate the issues discussed in this assignment of error as they were not part of the transcript of the Juvenile Court proceedings."
 {¶ 30} First we note that, while the guardian ad litem spoke to Van Buren and Woodmore, no one visited either of their homes or observed the children's interactions and interrelationships within either household, or the children's adjustments to their homes. R.C. 3109.04(F)(1)(c) and (d). The children have lost both their parents, and considering the children's best interests and long term welfare, home evaluations should have been done and a report generated to the trial court before an informed decision could be made regarding their custody. See In theMatter of Miller, Licking App. No. 04 CA 32, 2005-Ohio-856 (remand required where trial court granted county's request for permanent custody despite lack of evidence in the guardian ad litem's report of child's wishes as to custody; trial court to consider supplemental guardian ad litem report and render new decision regarding child's best interests). Of particular concern, as noted in the guardian ad litem's report, is that "Mr. Smith indicated that he had been investigating Ms. Woodmore for quite some time. Mr. Smith stated that he had discovered a history of domestic violence with regards to Ms. Woodmore. Additionally, Mr. Smith stated that Ms. Woodmore's brother is/has been incarcerated, and that the husband of Ms. Woodmore's cousin is currently incarcerated. As such, Mr. Smith stated a concern with the history of criminal activity within Ms. Woodmore's family."
 {¶ 31} Additionally, Shamika Watson, Woodmore's cousin, informed the guardian ad litem "that she has overheard the children's paternal grandfather (father of Rondal Wade, Sr.) state that the children's mother was killed by his son due to her infidelity and that his son did what he had to do, given the situation. Ms. Watson also overheard the children's father instructing a cousin on one hundred ways to kill a person. This conversation was overheard at a family gathering approximately three months prior to Mother's death. Based on these issues, Ms. Watson believes the children would be safest with Ms. Van Buren."
 {¶ 32} We agree with the magistrate that the "children deserve to have stability." Fred Barnes, PhD., who performed an assessment on Woodmore's family, indicated to the guardian ad litem that "Woodmore's own children are struggling with the adjustment of having the children in her home." While the trial court determined that the "Magistrate was appropriate in using age as a factor" in designating Woodmore as the primary residential parent, there is no evidence Van Buren is in ill health and the court uprooted the boys primarily on that basis from a home where they enjoyed an ongoing relationship with their maternal grandmother.
 {¶ 33} The record reveals seemingly disturbing facts regarding the Woodmore home, including adjustment issues, no previous bonding of the boys with their half sister, and hygiene problems. At a minimum, home studies should have been conducted before removing young children from a stable grandmother to a largely unknown home environment in California.
 {¶ 34} For the foregoing reasons, it is in the children's best interest that home investigations be performed, and we remand this matter to the trial court for further proceedings following home evaluations of both VanBuren's and Woodmore's homes.
GRADY, P.J. and BROGAN, J., concur.